# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

JACQUELINE SCARLETT )
LANIER, )
 )
   Plaintiff, )
 )
v. ) Case No. CV414-002
 )
CAROLYN W. COLVIN, )
*Acting Commissioner of Social* )
*Security*, )
 )
   Defendant. )

## REPORT AND RECOMMENDATION

Jacqueline Lanier, a 45-year-old woman suffering from multiple medical conditions (including a hip replacement, a right foot fracture, depression, anxiety, and chronic substance abuse), appeals the Commissioner's denial of her requests for disability and disability insurance benefits and supplemental security application. (Doc. 1.) Her claims were denied both initially and upon reconsideration. (Tr. 19.) Thereafter, an Administrative Law Judge ("ALJ") conducted a hearing and again denied benefits. (Tr. 19-33; 41-93 (hearing transcript).) The

Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.) Now she complains in this Court that the Commissioner erred in reaching her decision. (Doc. 1.) For the following reasons, the Commissioner's decision should be affirmed.

I. STANDARD OF REVIEW

Affirmance of the Commissioner's decision is mandatory if her conclusions are supported by substantial evidence and based upon an application of correct legal standards. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is something more than a mere scintilla, but less than a preponderance." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted). It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted). If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Id.* at 1158-1159. This Court cannot

substitute its judgment for that of the Commissioner. *Barnes v. Sullivan*, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant. 20 C.F.R. § 404.1512; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To determine whether she has met the burden, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; *Dixon v. Astrue*, 312 F. App'x 227, 227-28 (11th Cir. 2009); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that she has not engaged in substantial gainful activity. *Jones*, 190 F.3d at 1228. At step two, she must demonstrate a severe impairment or combination of impairments. *Id.* Then, at step three, if the claimant's impairment meets or equals a listed impairment, she is automatically found disabled. *Id.* If not, she must advance to step four, which requires her to prove an inability to perform past relevant work. *Id.* At that step the ALJ assesses "the claimant's residual functional capacity ('RFC')" and "ability to return to her past relevant work." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). "[T]he regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments." *Id.* (citing

3

20 C.F.R. § 404.1545(a)); *Moore v. Comm'r of Soc. Sec.*, 478 F. App'x 623, 624 (11th Cir. 2012). If she cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Moore*, 478 F. App'x at 624.

## II. MEDICAL HISTORY

Lanier's mental health treatment notes start in 2005. (Tr. 431.) After frequently reporting that she was depressed, she was started on Effexor and Klonopin. (Tr. 433, 436.) Eventually, Cymbalta was added (tr. 441), then phentermine for weight loss (tr. 443), and Ambien for sleep (tr. 446). She was involved in a car accident in February 2007 when she fell asleep and drove into a tree, causing serious injuries to her left hip and right foot. (Tr. 428.) She underwent surgery, physical therapy, and continued mental health counseling, but she managed to return to work in May 2007. (Tr. 21.) In December 2007, she visited Dr. Mark Jenkins, an orthopedic surgeon, complaining of pain in her right foot. (Tr. 365.) She begged for pain medication and explained that she is allergic to all hydrocodone products except Norco. (Tr. 365.) He diagnosed her with right-foot plantar fasciitis and recommended surgery.

4

(Tr. 22; tr. 365.) He explained to her that she needed to wean herself off her narcotic use and that she should not remain on narcotics for more than a few weeks post surgery. (Tr. 22; tr. 365.) After the surgery, she had a break in treatment until February 2008, when x-rays revealed that she had a stress fracture in her right foot. (Tr. 22.) Nevertheless, she was released back to work. (*Id.*) She continued working off and on until October 1, 2008, her alleged onset date. (*Id.*)

In March 2009, plaintiff reported to Memorial Health complaining of left hip and right foot pain. (*Id.*) An examination turned up little more than tenderness and found no acute abnormalities. (Tr. 22-23.) In April 2009, Dr. Leonard Talarico, a podiatrist, diagnosed her with "moderate sensory polyneuropathy." (Tr. 23.) It was controlled with Neurontin. (*Id.*) She returned several times, but on June 9 she told the doctor that she had "found" some Lorcet that helped with her right ankle pain. (Tr. 23; tr. 377 (asking for Lorcet).) According to the doctor, she "repeatedly asked for pain medicine today and was getting upset when I refused." (Tr. 377.)

On June 16, after a CT scan, the doctor discovered ankle ligament and tendon tears, and she immediately asked again for pain medication.

5

(Tr. 376.) Despite her injuries, the doctor refused to prescribe opioid pain medication "due to its addictive potential." (Tr. 379.) She underwent surgery on June 25, 2009. (Tr. 373-375.) The next day, she complained that the post-surgical Lortab was ineffective and she requested a prescription for Tylox, a more powerful opioid containing oxycodone. (Tr. 371.) He appears to have denied her request. When she came in again on July 13, 2009, she requested another prescription for Lortab. (Tr. 370.) On July 24, the doctor noted that plaintiff "continues to ask for additional pain medication while she is putting weight on her foot and not following my instructions." (Tr. 369.)

In February 2010, Lanier reported to Memorial University Medical Center complaining of left hip pain. (Tr. 23.) They discovered some degenerative changes, and she was diagnosed with a hip strain. (*Id.*) In August, she visited St. Joseph's Candler requesting a referral to pain management for her persistent foot and hip pain. (Tr. 24.) She was referred to the Center for Advanced Pain Management. (*Id.*) On September 23, 2010, she admitted to taking Lortab and Ativan, and she stated that when she lacked insurance, she would take her father's pain medications. (Tr. 428.) Notably, however, she denied any illicit drug

use. (Tr. 429.) The doctor prescribed her hydrocodone. (Tr. 430.) During this time, she reported to her psychiatrist that she had applied for work with the recreation department. (Tr. 467.) At the next pain-management appointment, she told the physician that she had fallen while playing badminton. (Tr. 426.) He prescribed her a three month supply of Norco. (Tr. 427.) A urinalysis, however, showed that she tested positive for cocaine. (Tr. 426.) When she returned in January 2011, she was advised to avoid alcohol concurrent with the use of opiates and to cease all use of illegal drugs. (Tr. 546.) Her Norco prescriptions were stopped. (Tr. 547.) In April, however, she was restarted on Norco. (Tr. 549.) On July 20, 2011, Lanier again tested positive for illegal drugs, including THC and PCP.[1] (Tr. 540.) Given her multiple violations of "her signed pain agreement," she was discharged as a patient. (Tr. 540.)

Plaintiff's medical history is somewhat unremarkable until December 2012. First, she began seeing Dr. John Adams, Ph. D., for psychological counseling. (Tr. 577.) She confided to him that she didn't always take her medication properly. (*Id.*) While she showed signs of depression, virtually all of her treatment notes focus on her relationship

---

[1] She also tested positive for morphine and lorazepam, which she had not been prescribed. (Tr. 550.)

with her son. Despite suffering from what Dr. Adams suggested to be crippling depression, she was able to secure for her son a pair of glasses from the Lyons Club. She also contacted his teacher about a grading error which was later corrected, regularly checked over his school work, and was able to take her son to the "to the fair." (Tr. 557-578.) Next, she returned to Dr. Jenkins with new complaints of pain. (Tr. 26.) She had broken a plate in her hip after a fall. (Tr. 682.) She underwent surgery for the removal of the hardware that had been installed in her hip after the 2007 car accident. (Tr. 26.) Dr. Jenkins performed a total hip arthroplasty. (Tr. 679.)

## III. ANALYSIS

According to the ALJ, Lanier had not engaged in substantial gainful activity since October 1, 2008, the alleged onset date. (Tr. 21.) At step two, the ALJ found that plaintiff's severe impairments include a left hip fracture and replacement, a right foot fracture, depression, anxiety, and a history of substance abuse. (Tr. 21.) He found that none of the impairments met a step-three listing. (Tr. 28.) At step four, the ALJ found that

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can sit, stand, and walk for a total of six out of eight hours during an eight-hour workday with an option to change from sitting to standing at will. She should never use foot controls, climb ladders, or crawl or work at heights. She can perform occasional climbing of stairs, balancing, stooping, kneeling, and crouching. She can occasionally work with and around moving mechanical parts. She can have occasional contact with supervisors, co-workers, and the public.

(Tr. 29.) After questioning a vocational expert ("VE"), the ALJ determined that Lanier is capable of performing her past relevant work as a general clerk. (Tr. 31.) Moreover, there were several other occupations she could pursue. (Tr. 32.) Accordingly, the ALJ found that Lanier is not disabled. (*Id.*)

Lanier claims that the ALJ erred by: (1) improperly discounting her treating psychiatrist's residual functional capacity assessment; (2) failing to properly evaluate plaintiff's subjective allegations of pain and functional limitations; (3) failing to evaluate plaintiff's concentration limitations; and (4) improperly concluding that plaintiff could carry at least ten pounds for two-thirds of a workday. (Doc. 14 at 1.)

### A. Treating Psychologist's RFC Assessment

Dr. Adams, Lanier's treating psychologist, stated that her mental problems were almost uniformly marked or extreme. (Tr. 554-55.) As the ALJ explained:

> On December 13, 2012, Dr. Adams completed a Medical Assessment of Ability to do Work-Related Activities (Mental) in which he states his opinion that claimant has marked to extreme limitation in her ability follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisor[s], deal with work stress, function independently, and maintain attention/concentration. He further opines claimant has extreme and marked limitations in understanding, remembering, and carrying out simple to complex job instructions. He also opines claimant has marked and extreme limitations with behaving in an emotionally stable manner, relating predictably in social situation, and demonstrating reliability. His report also includes a statement that claimant does not wish to be the payee of any funds awarded because she "throws her money away and uses it unwisely."

(Tr. 27.) According to the Social Security Administration's Program Operations Manual System ("POMS"), a "marked limitation" is one that "interferes seriously" with a claimant's "ability to initiate, sustain, or complete activities." POMS DI 25225.020, available at https://secure.ssa.gov/poms.nsf/lnx/0425225020. An "extreme limitation," is "more than marked," and "may . . . very seriously" limit "day-to-day functioning." *Id.* According to Lanier, the ALJ should have accepted

Dr. Adams' evaluation, and it was thus improper for him to assign Dr. Adams' treating source statement "little weight."[2] (Doc. 13 at 5-7.)

Notably, no other medical evidence of record suggests that Lanier's depression and anxiety were so fundamentally crippling. In fact, before starting treatment with Dr. Adams, Lanier told her treating psychiatrist that she was hoping to get a job but had applied for disability (though she was "unclear as to what her disability may be"). (Tr. 467.) The state psychological examiners similarly found that plaintiff had, at most, mild limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 506 & 522.) And as the ALJ explained in

---

[2] While an ALJ must accord substantial weight to the opinion, diagnosis, and medical evidence of a treating physician, he still retains the power to discount such testimony when a doctor has crossed the line from medical practitioner to patient advocate. The ALJ, however, must show good cause for giving a treating physician less than substantial weight. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d at 583; 20 C.F.R. § 404.1527(d); *Farkas v. Astrue*, 2012 WL 750547 at * 6 (M.D. Fla. Mar. 8, 2012).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Therefore, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

*Farkas*, 2012 WL 750547 at * 6.

detail, the limitations Dr. Adams describes do not square with his own treatment notes:

> Dr. Adams's . . . opinion that claimant has marked to extreme limitation in her ability follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisor, function independently, and maintain attention/concentration contradict his statements that claimant is compliant with her medication, keeps appointment[s], and is a good mother, who provides a good home for her son, as well as taking care of her parents. His opinions with regard to claimant's abilities to get along with others is not consistent with statements in his May 21, 2012 treatment notes in which he describes how well she manages herself around her home and does not cause[] any problems with others in her home. Dr. Adams notes claimant is not typically to blame or at fault for the relationship problems in her family. His opinions with regard to claimant's ability to remember, understand, and carry out instructions, along with his opinion of her limitations in maintaining attention and concentration are contradictory to his notes about claimant checking over her son's homework and finding errors in how his work was scored. His opinions with regard to claimant's difficulty interacting with others are not consistent with reports of her attending school functions for her son, interacting with his teachers, and taking him to other events. The statement that claimant throws her money away and does not spend it wisely directly contradicts a report in Dr. Adams' April 5, 2012 treatment notes, which states claimant is very careful on how she spends money and that this is a good trait on her part (Exhibit 18-F).

(Tr. 27-28.)

The evidence of record supports the ALJ's decision to discount Dr. Adams' disability assessment. The ALJ applied the proper legal standard

12

and had good cause to construe his treating source statement as patient advocacy rather than a sound medical determination.

### B. Subjective Allegations

Lanier contends that the ALJ cherry-picked evidence to undermine her assertions of crippling pain and functional limitations. (Doc. 14 at 8.) Thus, she contends, he erred by discrediting her subjective allegations of pain and functional limitations. (*Id.* at 7-9.)

When a claimant attempts to establish disability through his or her own testimony of subjective pain, the "pain standard" applies. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir.2005). The pain standard demands:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). When coupled with medical evidence which satisfies the pain standard, a claimant's testimony of subjective pain is, in and of itself, sufficient to sustain a disability determination. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). If the ALJ decides to discredit the claimant's testimony, he or she

13

must "articulate explicit and adequate reasons" for doing so. *Id.* The ALJ's finding as to credibility, however, need not be explicit. *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). The implication, though, "must be obvious to the reviewing court." *Id.*

Here, the ALJ discussed Lanier's allegations at length:

> The claimant reports continuous pain in her right foot and sharp pain going all the way down her legs. She testified pain medication did not help. [Sh]e also alleged always having hip pain. She alleged crying on a daily basis. She reported trouble sleeping. She testified she feels and hears the car that hit her. Claimant alleges her physical impairments limit her ability to perform normal daily activities. She reports difficulty with standing, walking, bending, sitting, squatting, reaching, and using her hands. She further alleges her mental impairments limit her ability to perform the mental requirements of daily activities and decreases her motivation to take care of her personal hygiene. She also reports problems with her memory, completing tasks, concentration, and getting along with others (Exhibit 12-E). Claimant testified to using a walker since her recent injury in December of 2012.

(Tr. 30.) He found that there were times since the disability onset date when she was substantially limited by her injuries:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments resulted in periods when she experienced limitations in her ability to perform standing, walking, squatting, climbing, and crawling. During these periods, claimant would also experience pain that would limit her ability to maintain attention, concentration, and pace.

(*Id.*) But her

14

records also show that after her accident in 2007, in which she sustained the injury to her hip and foot, she was able to return to full time work activity. She performed regular and continuing work for a period of at least 12 months. In Her Disability Report-Adult she denied receiving any special consideration or assistance in performing her job. She provided inconsistent statements with regard to why she stopped working in 2008. In her Disability Report Adult, she reports her condition did not cause her to make changes in her work activity, but that she was let go because she was late for work. At other times, she reported she was laid off.

(*Id.*) Not only did she return to work after the accident, she frequently engaged in drug seeking behavior:

> The claimant's allegations of the intensity and frequency of her pain are questionable given her history of substance abuse. Claimant admits she abused her pain medications, which brings into question if she reported having greater levels of pain and chronic pain in order to get narcotic medications. As discussed, claimant also made misleading statements to her physicians about her drug use and abuse. She frequently reported to her physicians and psychiatrist that she did not abuse prescription medication or use illegal drugs. She contradicts her allegations of no illegal drug use or abuse with admissions of abusing pain medication and using illegal drugs. Results from drugs screen were also positive for non-prescribed narcotic medications and illegal drugs. Claimant was confronted with . . . the results of her drug test and warned against continued use of illegal drug or misuse of prescribed medications. Despite the warning, claimant continued to use and abuse drugs, which resulted in her dismissal from pain management Claimant misled treatment providers with regard to the extent of her drug use and abuse. While she might admit a history of cocaine use to one of her psychotherapists, she would not report her continuing misuse of prescription medications or her use of other illegal drug use.

(*Id.*) In addition, she frequently sought hydrocodone-based medications, yet at times insisted that it provided no relief and at other times stated that she was allergic to hydrocodone. (*Id.*) As for her alleged functional limitations, the ALJ was similarly unpersuaded:

> Claimant's allegations about the restrictions on the use of upper extremities and restrictions on her ability to perform prolonged sitting are also inconsistent with her reported daily activities. Claimant reported performing significant daily activities including cooking, cleaning, and taking care of her minor son. She also reported providing care for her parents. Claimant's records report her appearance was appropriate. There are no reports of sustained problems with her personal hygiene. She also reported spending a good deal of her time sitting, which contradicts her allegations that she can only sit for short periods. Her allegations with regard to limitations on her memory, attention, and concentration are also inconsistent with her reported daily activities, as they demonstrate her ability to understand, remember, and follow instructions and to maintain attention for completion of tasks. Treatment notes from claimant's psychologist show she was very involved in her son's education and upbringing. She reports checking his homework, taking him to appointments, and carefully following his progress in school and treatment
>
> While claimant reports very little social interaction, her treatment notes discuss her interaction with friends, boyfriends, and various roommates.

(Tr. 29-30.)

Lanier contends that the ALJ cherry-picked evidence from her testimony showing that she performed "significant" daily activities such as cooking, cleaning, and taking care of her son. (Doc. 14 at 9.) While it

16

is true that she qualified those activities by stating that she merely microwaves food and straightens her trailer (tr. 70), the remaining evidence of record shows that she was regularly involved in activities that required substantial amounts of physical exertion, including seeking employment (tr. 467), taking her son to the state fair (tr. 557-578), playing badminton (tr. 426), and biking to a physical therapy evaluation (tr. 476). While Lanier's pain had unquestionably worsened by the time of the hearing (days before the hearing, a friend had a seizure and fell on her, which broke the hardware in her hip and led to her last hip surgery (tr. 595)), there is substantial evidence of record supporting the ALJ's credibility determination.[3]

### C. Concentration limitations

Lanier claims that the ALJ erred by discounting her non-exertional limitations (specifically her problems with concentration) and by failing to include any mention of those limitations in his hypothetical to the vocational expert. (Doc. 14 at 9-11.)

---

[3] She also takes issue with his note that her allegations of pain were inconsistent with her frequent gaps in treatment. (Doc. 14 at 8.) The Court agrees that one may experience pain without seeking medical treatment for any of a number of reasons. But this was hardly the sole basis for his determination. Even if the ALJ erred by relying upon the gaps in treatment as evidence undermining her credibility, the error was harmless in light of the record as a whole. *E.g., Carson v. Comm'r of Soc. Sec.*, 300 F. App'x 741, 746 n.3 (11th Cir. 2008).

The ALJ accepted that Lanier had mild difficulty with concentration, but he did not believe that problem was so pronounced that it would at all impact her work life. (Tr. 29.) Not only was the medical evidence contradictory, her reported daily activities "demonstrate her ability to understand, remember, and follow instructions and to maintain attention for completion of tasks." (Tr. 31.) Substantial evidence of record supports his finding. Dr. Adams explained at length the amount of work Lanier had put into her son on a daily basis, and the record is replete with psychological and psychiatric evidence discounting her assertion that her problems with concentration would be work-limiting. After her car accident, her treating psychiatrist repeatedly characterized her concentration level as "good." (Tr. 453, 455, 457, 466.) Furthermore, a consultative examiner noted during testing that Lanier "did experience apparent irritation and apparent pain that likely resulted in a slightly diminished concentration and may have interfered with optimal performance, yet her ADL's demonstrated her ability to initiate and sustain goal directed behavior with little or no apparent interference in concentration." (Tr. 483.) Also, her "[c]oncentration in her mental performance is adequate. Claimant's

18

ability to sustain concentration seems fairly adequate." (*Id.*) Since substantial evidence supports the ALJ's decision to discount her claim that concentration problems would impact her ability to return to work, he was not required to include that limitation in his hypothetical to the VE.

**D. Ability to Carry Ten Pounds**

Finally, plaintiff contends that the ALJ erred by finding that plaintiff could lift and carry at least ten pounds for two thirds of the workday. (Doc. 14 at 11-12.) Since her mobility is limited,[4] she reasons that she clearly lacks the ability to perform such a task and therefore is incapable of returning to work.

Lanier substantially misrepresents the ALJ's determination. The full range of light work requires "frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); 20 C.F.R. §

---

[4] Admittedly, plaintiff has frequently needed assistive devices to ambulate, but she has only used them for short periods of time. She reported during a physical therapy assessment that she sometimes used a walker and wheelchair around the house (tr. 477), but she rode her bicycle to that physical therapy session. The only times her ambulation were limited was after her car accident (which was before the disability onset date), and after her foot surgeries with Doctors Talarico (tr. 371) and Jenkins (tr. 364, again before disability onset date)). No other medical evidence of record supports her claim. Dr. Strieff, a treating physician, noted in a December 2012 disability review that she can move around without issue and without the use of any assistive devices. (Tr. 580-584.)

416.967(b). But the ALJ found that Lanier *could not* perform the full range of light work. Instead, he found that she could only perform a job where she had the option to sit and stand *at will* over the course of a full work day. (Tr. 29.) He thus limited her to a small subset of light work, including work as a clerk or parking lot attendant. (Tr. 31-32.)

## IV. CONCLUSION

The ALJ's determination that claimant could return to work is supported by substantial evidence of record. Consequently, the Commissioner's decision denying benefits should be **AFFIRMED**.

**SO REPORTED AND RECOMMENDED** this 14th day of April, 2015.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA